SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. William Hill** (A-41-22) (087840)

**Argued October 10, 2023 -- Decided January 18, 2024**

**WAINER APTER, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the State's witness tampering statute, N.J.S.A. 2C:28-5(a), is unconstitutionally overbroad on its face or was unconstitutionally applied to defendant William Hill.

Defendant was charged with first-degree carjacking after the victim, A.Z., selected his photo in a photo array. While defendant was detained and awaiting trial, he sent a letter addressed to A.Z. by name at her home. Defendant maintained that he did not commit the carjacking and stated, "[i]f it's me that you're claiming as the actor of this crime without a doubt, then disregard this correspondence. Otherwise please tell the truth if you're wrong or not sure 100%." A.Z. delivered the letter to the police, and defendant was charged with third-degree witness tampering, in addition to the carjacking charge.

Under N.J.S.A. 2C:28-5(a), a person commits third-degree witness tampering "if, believing that an official proceeding or investigation is pending . . . he knowingly engages in conduct" that does not involve force or the threat of force but "which a reasonable person would believe would cause a witness or informant to" testify or inform falsely, withhold any testimony, elude legal process, absent himself from any proceeding or investigation, or otherwise obstruct an official proceeding or investigation. The letter did not explicitly ask A.Z. to do any of those things.

At trial, A.Z. testified that receiving the letter "was terrifying" and made her "scared" to testify because she realized defendant knew where she lived. A redacted version of the letter was admitted into evidence, and a detective read the letter aloud to the jury. The State focused on the contents of the letter during opening and closing statements. The prosecutor told the jury during summation to "read the letter" and "look at the contents [of the letter]." The prosecutor's slideshow presentation during summation included portions of the letter, and the jury heard a playback of the detective reading the letter during deliberations. Defendant was convicted of both charges.

1

The Appellate Division affirmed, holding that "N.J.S.A. 2C:28-5(a) is neither unconstitutionally overbroad nor impermissibly vague" and that "[a] defendant awaiting trial has no First Amendment right to communicate directly with the victim of the alleged violent crime." 474 N.J. Super. 366, 370, 379 (App. Div. 2023).

The Court granted certification "limited to whether the witness tampering statute, N.J.S.A. 2C:28-5(a), is unconstitutionally overbroad." 253 N.J. 595 (2023).

**HELD:** N.J.S.A. 2C:28-5(a) is not unconstitutionally overbroad. It may, however, have been unconstitutionally applied to defendant in this case. The Court therefore vacates defendant's witness tampering conviction, without dismissing any portion of the indictment, and remands the case for a new trial on that charge. The Court does not vacate defendant's conviction for carjacking.

1. Some types of speech are so utterly lacking in social value that they fall outside the protections of the First Amendment altogether. Those historically unprotected categories of speech include fighting words, obscenity, child pornography, incitement, defamation, true threats, and speech integral to criminal conduct. The parties here dispute the relevance of the final two exceptions in this case. A true threat is speech that, when taken in context, objectively threatens unlawful violence. Speech integral to criminal conduct is speech that is intended to bring about a particular unlawful act. (pp. 15-18)

2. Overbreadth is unlike a typical facial challenge because it does not require a challenger to establish that no set of circumstances exists under which the statute would be valid. Rather, a court may hold a law facially invalid for overbreadth under the First Amendment if the challenger demonstrates that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep. See United States v. Hansen, 599 U.S. 762, 769-70 (2023). A law's unconstitutional applications must be realistic, and their number must be substantially disproportionate to the statute's lawful sweep. Without a lopsided ratio, courts must handle unconstitutional applications case-by-case. (pp. 18-19)

3. The Court reviews the witness tampering statute and agrees with the Appellate Division that N.J.S.A. 2C:28-5(a) is not unconstitutionally overbroad, but for different reasons. The Court does not agree that any communication between a defendant awaiting trial and the victim of a violent crime categorically falls outside the protections of the First Amendment. Courts do not have freewheeling authority to declare new categories of speech outside the First Amendment simply because the value of the speech is less than its societal costs. Instead, speech falls outside the scope of the First Amendment if it falls into one of the historic and traditional categories to which the First Amendment has not applied. (pp. 19-22)

2

4.  The reason defendant's overbreadth claim fails is that there are not far more witness tampering prosecutions for protected speech than for conduct or unprotected speech.  Indeed, the heartland of witness tampering prosecutions either do not involve speech at all or prosecute speech that is integral to criminal conduct and is thus unprotected.  On the other side of the ledger, the list of potentially unconstitutional prosecutions under N.J.S.A. 2C:28-5(a) appears to be either zero or one (this case).  The ratio of unlawful-to-lawful applications of the witness tampering statute is not lopsided enough to justify facial invalidation for overbreadth.  Quite simply, "[t]his is not the stuff of overbreadth -- as-applied challenges can take it from here."  Hansen, 599 U.S. at 785.  (pp. 22-27)

5.  Although N.J.S.A. 2C:28-5(a) is not facially overbroad, it may have been unconstitutionally applied to defendant.  Defendant was prosecuted for the contents of his letter, which would have been unproblematic if the jury had been required to find that his speech fell into a recognized category of unprotected speech.  The true threats exception is not relevant here because defendant's letter does not contain any threat of violence and he was prosecuted for third-degree witness tampering, which specifically excludes the threat of force.  And because the letter is facially innocuous, in order to prove that it was speech integral to criminal conduct -- in this case, witness tampering -- the State was required to prove that defendant intended the letter to cause A.Z. to testify falsely, withhold testimony or information, elude legal process, absent herself from a legal proceeding or investigation, or otherwise obstruct, delay, prevent, or impede an official proceeding or investigation.  Because the jury here was not so charged, defendant's conviction for witness tampering must be vacated.  The Court provides guidance for the new trial.  (pp. 27-31)

6.  The Court declines to dismiss the witness tampering charge because there is no requirement that the speech succeed in bringing about an unlawful act and because a reasonable jury could conclude that defendant sent the letter to pressure A.Z. to refrain from testifying against him -- i.e., intending to tamper with a witness. (pp. 31-32)

**REVERSED as to count two and REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, FASCIALE, and NORIEGA join in JUSTICE WAINER APTER's opinion.**

3

SUPREME COURT OF NEW JERSEY

A-41 September Term 2022

087840

State of New Jersey,

Plaintiff-Respondent,

v.

William Hill, a/k/a
Raheem Hill, Ricky Hill,
Russell Johnson, Jerry
Jones, Raheem Sander,
Raheem Sanders, Joseph
Sanders, Bruce Strickland,
Bruce Strictland, Andrew
Young, Andy Young, and
Steven Young,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
474 N.J. Super. 366 (App. Div. 2023).

| Argued | Decided |
|--------|---------|
| October 10, 2023 | January 18, 2024 |

John P. Flynn, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John P. Flynn, of counsel and on the briefs).

Patrick R. McAvaddy, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County

1

Prosecutor, attorney; Patrick R. McAvaddy, on the briefs).

Tim Sheehan, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Michael L. Zuckerman, Deputy Solicitor General, Tim Sheehan, and Amanda G. Schwartz, Deputy Attorney General, of counsel and on the brief).

Ronald K. Chen argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Rutgers Constitutional Rights Clinic Center for Law & Justice and American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom and Jeanne LoCicero, of counsel and on the brief, and Ronald K. Chen, on the brief).

Doris Cheung argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; Doris Cheung, on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

In this appeal, we consider whether the State's witness tampering statute, N.J.S.A. 2C:28-5(a), is unconstitutionally overbroad on its face or was unconstitutionally applied to defendant William Hill. We hold that N.J.S.A. 2C:28-5(a) is not unconstitutionally overbroad. It may, however, have been unconstitutionally applied to defendant in this case. We therefore vacate defendant's witness tampering conviction, without dismissing any portion of

2

the indictment, and remand the case for a new trial on that charge. We do not vacate defendant's conviction for carjacking.

I.

A.

On the morning of October 31, 2018, A.Z. left her car running outside her home as she ran inside to grab a sweater. When she returned to her car, she saw a man she did not know in the driver's seat. She ran to the car, opened the driver's door, and yelled at the man to get out. The man refused, putting the car in reverse. As the car moved backward, A.Z. jumped into the car and on top of the man.

The man put the car in drive and began to speed away while A.Z. wrestled for control of the steering wheel, her feet dangling out of the open car door. As he sped down the street, the man tried to force A.Z. out of the car by shoving her and swerving into parked cars, causing the still-open car door to repeatedly hit A.Z. in the back. After about four blocks, A.Z. was able to shift the gear into neutral and the car began to slow down. The man then hit the brakes, pushed A.Z. aside, jumped out of the car, and ran.

A.Z. immediately pulled over outside the Harrison police station and went inside to report the attempted carjacking. She estimated that the attempted carjacking lasted approximately two minutes.

3

A.Z. returned to the police station one week later to view a photo array, eventually selecting the photo of defendant with eighty percent certainty. Defendant was charged with one count of first-degree carjacking in violation of N.J.S.A. 2C:15-2(a)(1).

B.

While defendant was detained and awaiting trial, he sent a letter to A.Z. at her home. Defendant addressed the envelope to A.Z. by name, and he placed his own name in the return address. At the time, a no-contact order was not in place. The letter, in the redacted form as introduced at trial, read as follows:

> Dear Ms. [Z.],
>
> Now that my missive had completed its journey throughout the atmosphere and reached its proper destination, I hope and pray it finds its recipient in the very best of health, mentally as well as physically, and in high spirits.
>
> I know you're feeling inept to be a recipient of a correspondent from an unfamiliar author but please don't be startled because I'm coming to you in peace. I don't want or need any more trouble.
>
> Before I proceed, let me cease your curiosity of who I be. I am the guy who has been arrested and charged with Car Jacking upon you. You may be saying I have the audacity to write to you and you may report it but I have to get this off my chest, I am not the culprit of this crime.

4

Ms. [Z.], I've read the reports and watched your videotaped statement and I'm not disputing the ordeal you've endured. I admire your bravery and commend your success with conquering a thief whose intention was to steal your vehicle. You go girl! [smiley face].

Anyway, I'm not saying your eyes have deceived you, I believe you've seen the actor but God has created humankind so close in resemblance that your eyes will not be able to distinguish the difference without close examination of people at the same time. Especially not while in wake of such commotion you've endured.

. . . .

Ms. [Z.], due to a woman giving me the opportunity to live life instead of aborting me, I have the utmost regards for women, therefore, if it was me you accosted, as soon as my eyes perceived my being in a vehicle belonging to a beautiful woman, I would have exitted your vehicle with an apology for my evil attempts. However, I am sorry to hear about the ordeal you had to endure but unfortunately, an innocent man (me) is being held accountable for it.

Ms. [Z.], I don't know what lead you into selecting my photo from the array, but I place my faith in God. By His will, the truth will be revealed and my innocents will be proven. But however, I do know He works in mysterious ways so I'll leave it in His Hands.

. . . .

Ms. [Z.], I'm not writing to make you feel sympathy for me, I'm writing a respectful request to you. If it's me that you're claiming as the actor of this crime without a doubt, then disregard this correspondence. Otherwise please tell the truth if you're wrong or not sure 100%.

5

Ms. [Z.], I'm not expecting a response from you but if you decide to respond and want a reply, please inform me of it. Otherwise you will not hear from me hereafter until the days of trial.

Well it's time I bring this missive to a close so take care, remain focus, be strong and stay out the way of trouble.

Sincerely,
Raheem

A.Z. delivered the letter to the Harrison Police Department. In a superseding indictment, defendant was charged with third-degree witness tampering in violation of N.J.S.A. 2C:28-5(a), in addition to the carjacking charge. Under N.J.S.A. 2C:28-5(a), a person commits third-degree witness tampering "if, believing that an official proceeding or investigation is pending . . . he knowingly engages in conduct" that does not involve force or the threat of force but "which a reasonable person would believe would cause a witness or informant to: (1) Testify or inform falsely; (2) Withhold any testimony . . . ; (3) Elude legal process . . . ; (4) Absent himself from any proceeding or investigation . . . ; or (5) Otherwise obstruct . . . an official proceeding or investigation."

## C.

At trial, A.Z. testified that as she read the letter, she "kind of relived the whole moment all over again" and "it was terrifying." Receiving the letter at

6

her home made her feel "scared to come" testify at trial, A.Z. explained, because she realized defendant knew where she lived.

A redacted version of the handwritten letter, reprinted above, was admitted into evidence at trial. The State also called a detective from the Hudson County Prosecutor's Office to read the redacted letter aloud to the jury.

The State focused on the contents of the letter during opening and closing statements. In his opening, the prosecutor read portions of the letter out loud. During summation, the prosecutor said: "The letter's really important. Again, you've got to go deep into it. . . . Look at the letter that he wrote and ask yourself, would you write that letter, because we're going to do that, and I don't think any of you would."

Defense counsel objected, and the trial judge ruled that the prosecutor could read the contents of the letter but could not use the text to argue that defendant had admitted to the carjacking. The prosecutor attempted to do so, but after another objection, eventually told the jury, "[w]e're going to skip the letter, but the letter's going with you. You read it. You determine is this the letter -- what does this letter say?" (emphasis added). He then repeated:

> It's your question, you look at the contents [of the letter], right? What is he saying to her? What is he trying to do? What is a reasonable person to take from it? I'm not going to say more than that. That's for you

7

guys -- read the letter.  Think about it in the context of all this, right?

The slideshow presentation that the prosecutor used during summation also included numerous slides highlighting specific portions of the handwritten letter, along with the outside of the envelope showing A.Z.'s address.

At the close of the State's case, defendant moved for a judgment of acquittal on both charges.  On the witness tampering charge, defense counsel argued that "there was nothing in the letter that the prosecutor could point to that in any way shows that Mr. Hill was trying to threaten [A.Z.], [or] trying to get her to be afraid to come into court."  The trial court denied the motion, holding that although "there's nothing in the letter that is threatening . . . a reasonable juror could conclude that a reasonable person would feel somewhat upset . . . [that] the person arrested for carjacking her is now writing to her at her home."

The judge instructed the jury on witness tampering in accordance with the Model Criminal Jury Charges, which largely mirror the language of N.J.S.A. 2C:28-5(a).  See Model Jury Charges (Criminal), "Tampering with Witnesses and Informants (N.J.S.A. 2C:28-5(a)) (Cases arising after September 10, 2008)" (approved Mar. 2009).

During deliberations, the jury requested a typed, rather than handwritten, copy of the letter.  Because there was no such thing in evidence, they heard a playback of the detective reading defendant's letter.

The jury convicted defendant of first-degree carjacking and third-degree witness tampering.  Defendant moved for a new trial, contending that the State was required to, but did not, prove he intended to cause A.Z. to testify falsely or otherwise obstruct the proceeding.  The prosecutor maintained that three implicit and explicit messages in the letter allowed a jury to conclude that defendant "inten[ded] . . . to influence [A.Z.] in a way that the witness tampering statute is designed to protect" against:  (1) "I know where you live"; (2) "I know what you look like"; and (3) "stay out of trouble."

The judge denied the motion and sentenced defendant to twelve years' imprisonment on the carjacking conviction and a consecutive three years' imprisonment on the witness tampering conviction.

### D.

Defendant appealed, arguing, among other things, that N.J.S.A. 2C:28-5(a) is unconstitutionally overbroad and impermissibly vague unless it is read to require that defendants know their speech or conduct would cause a witness to testify falsely, withhold testimony, elude legal process, or otherwise obstruct any proceeding.

9

The Appellate Division invited the Attorney General, the American Civil Liberties Union of New Jersey (ACLU), and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate in the case as amici curiae, and it affirmed defendant's convictions in a partially published opinion. State v. Hill, 474 N.J. Super. 366 (App. Div. 2023).

Rejecting defendant's facial challenge to the witness tampering statute, the Appellate Division held that "N.J.S.A. 2C:28-5(a) is neither unconstitutionally overbroad nor impermissibly vague." Id. at 370. Relying on State v. Crescenzi, 224 N.J. Super. 142 (App. Div. 1988), in which it had rejected an overbreadth and vagueness challenge to a prior version of the witness tampering statute, the Appellate Division held that N.J.S.A. 2C:28-5(a) furthers the State's important interest in "preventing intimidation of, and interference with, potential witnesses or informers in criminal matters and easily meets the test of weighing the importance of this exercise of speech against the gravity and probability of harm therefrom." Hill, 474 N.J. Super. at 377-78 (quoting Crescenzi, 224 N.J. Super. at 148).

The Appellate Division rejected defendant's reliance on the United States Supreme Court's grant of certiorari in Counterman v. Colorado, 598 U.S. ___, 143 S. Ct. 644 (2023), noting that unlike Counterman, this case required it only to evaluate "speech directed to victims, witnesses, or

10

informants who are linked to an official proceeding or investigation." Hill, 474 N.J. Super. at 379. The "true threat[s]" doctrine was simply "not at issue," the Appellate Division held, because "[a] defendant awaiting trial has no First Amendment right to communicate directly with the victim of the alleged violent crime." Ibid. Otherwise, the Appellate Division explained, courts might be prohibited from imposing no-contact orders as a condition of pretrial release. Ibid.

E.

We granted defendant's petition for certification "limited to whether the witness tampering statute, N.J.S.A. 2C:28-5(a), is unconstitutionally overbroad" and denied certification "in all other respects." 253 N.J. 595, 595-96, reconsideration denied, 254 N.J. 397 (2023). The amici curiae who appeared before the Appellate Division continued to participate before this Court.

II.

Defendant argues that because his "witness-tampering conviction was entirely based on the content of his speech and required the jury to find only that [defendant] was negligent as to the possibility that his polite letter would cause the witness to testify falsely, the conviction violated his constitutional right to free speech." According to defendant, "the First Amendment

11

exception at issue in this case is true threats" and under the Supreme Court's decision in <u>Counterman</u>, true threats prosecutions require at least a mens rea of recklessness. Because N.J.S.A. 2C:28-5(a) requires only a mens rea of negligence -- that a defendant "knowingly engage[] in conduct which a reasonable person would believe would cause a witness or informant to" obstruct a proceeding -- defendant maintains it is facially overbroad. In order to save the statute from constitutional defect, defendant urges us to construe the "knowingly" mens rea in the statute to apply to both a defendant's speech or conduct, and to whether the defendant "<u>knew that the nature of his speech would cause a witness to withhold testimony</u>." (emphasis added).

The ACLU agrees with defendant that N.J.S.A. 2C:28-5(a) is unconstitutionally overbroad. The ACLU submits that as applied to defendant, N.J.S.A. 2C:28-5 violates the First Amendment under <u>Counterman</u> because defendant's "conviction for witness tampering was based on the 'reasonable person' standard of N.J.S.A. 2C:28-5, which <u>Counterman</u> found was constitutionally insufficient." The ACLU, however, asks us to strike down N.J.S.A. 2C:28-5(a) altogether, rather than "[c]reating a scienter requirement out of whole cloth."

The ACDL asserts that "criminal statutes must be construed to require proof of some level of scienter exceeding negligence." Therefore, defendant's

12

conviction, "which was based on a statute and jury charge that criminalized 'conduct' which a reasonable person would believe would cause a witness or informant to" testify falsely, must be reversed. On retrial, the ACDL submits, the jury must be instructed that defendant can only be convicted if the prosecution proves that he: "(1) believed that an official proceeding was pending; (2) knowingly sent a letter intending that it be received by [A.Z.]; (3) consciously desired that one or more violations of the statute would occur; and (4) knew that one or more violations of the statute would most likely occur."

The State responds that N.J.S.A. 2C:28-5(a) prohibits certain kinds of conduct, not speech. In the State's view, "[a]ny regulation of speech under the statute is therefore incidental and discussion of pure speech exceptions, like the true threats doctrine, is unnecessary." According to the State, defendant was not prosecuted for the contents of his letter, but for "engaging in a course of conduct that involved sending the letter to his victim's home before the trial, making it clear he knew who she was and where she lived." The State urges that "where a statute regulates conduct and not speech on its face, it should be invalidated as overbroad only when it burdens substantially more speech than necessary to advance its substantial government interest." Here, the State contends, defendant failed to satisfy this "heavy burden." According to the State, we should not find the statute facially overbroad because it

13

involves the "paramount state interest" of preventing witness tampering and, where it does restrict speech, it does so only incidentally.

The Attorney General agrees with the State that the statute is facially valid and that defendant did not meet his "overwhelming" burden in proving otherwise. The Attorney General explains that "mine-run" witness tampering prosecutions, such as those for murder, assault, and bribery, "do not involve protected expression at all" because they involve conduct, not speech. And those prosecutions that do involve speech, for example, soliciting perjury or extorting a witness, according to the Attorney General, fall within the First Amendment's exception for "speech integral to criminal conduct." Meanwhile, the Attorney General contends, "the other side of the ledger -- that is, the record of applications [of N.J.S.A. 2C:28-5(a)] that <u>violate</u> free-speech rights -- is pretty much blank." The Attorney General also rejects what it characterizes as the "core" of defendant's argument -- his as-applied challenge -- because defendant was not prosecuted for the content of his speech. Rather, the Attorney General claims, defendant was prosecuted for engaging in conduct that showed A.Z. he "knew her name . . . knew where she lived, [and] was willing to engage with her directly, . . . without using his attorney."

## III.

### A.

Defendant challenges the constitutionality of N.J.S.A. 2C:28-5(a) on the grounds that it is overbroad in violation of the First Amendment. "Our standard of review in determining the constitutionality of a statute is de novo." State v. Hemenway, 239 N.J. 111, 125 (2019). This Court owes no deference to the trial court or Appellate Division's conclusions of law. State v. Vargas, 213 N.J. 301, 327 (2013). "A presumption of validity attaches to every statute," and "defendant bears the burden of establishing its unconstitutionality." State v. Lenihan, 219 N.J. 251, 265-66 (2014).

### B.

The First Amendment to the United States Constitution, applied to the states by the Due Process Clause of the Fourteenth Amendment, commands that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31, 585 U.S. ___, 138 S. Ct. 2448, 2463 (2018).

Article I, Paragraph 6 of the New Jersey Constitution provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." N.J. Const. art. I, ¶ 6. The

first sentence of Article I, Paragraph 6 goes beyond the text of the First Amendment, and this Court has recognized that, in several contexts, New Jersey's constitutional protection of free expression is "more sweeping in scope" than the First Amendment. State v. Schmid, 84 N.J. 535, 557 (1980).

"Content-based regulations" of speech that fall within the protections of the First Amendment "are presumptively invalid," R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992), and will be upheld only if they survive strict scrutiny, see, e.g., Williams-Yulee v. Fla. Bar, 575 U.S. 433, 444 (2015). A restriction is content-based "if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." McCullen v. Coakley, 573 U.S. 464, 479 (2014) (quoting FCC v. League of Women Voters of Cal., 468 U.S. 364, 383 (1984)). Conversely, content-neutral regulations -- which generally control the time, place, and manner of speech -- must satisfy intermediate, rather than strict, scrutiny. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).

Some types of speech are so utterly lacking in social value that they fall outside the protections of the First Amendment altogether. Those historically unprotected categories of speech include fighting words, obscenity, child pornography, incitement, defamation, true threats, and speech integral to

16

criminal conduct. See, e.g., Counterman v. Colorado, 600 U.S. 66, 73-74 (2023); United States v. Hansen, 599 U.S. 762, 783 (2023).

The parties dispute whether the "true threats" or "speech integral to criminal conduct" exceptions are relevant in this case. A true threat is speech that, when taken in context, objectively threatens unlawful violence. In Counterman, the United States Supreme Court held that under the First Amendment, a true threats prosecution "requires proof that the defendant had some subjective understanding of the threatening nature of his statements," but that a "specific intent to threaten the victim" is not required; instead, recklessness suffices. 600 U.S. at 69, 73. The State must therefore show "that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Id. at 69.

Speech integral to criminal conduct is speech that is "intended to bring about a particular unlawful act." Hansen, 599 U.S. at 783. Indeed, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949). "For example, a robber's command that a victim turn over money," even though it is undeniably speech, is nonetheless unprotected by the First

17

Amendment or Article I, Paragraph 6 because it "is integral to the commission of" the crime of robbery. State v. Burkert, 231 N.J. 257, 282 (2017). "It would be an odd constitutional principle that permitted the government to prohibit" robbery, but not the words a person uses to commit robbery (e.g., "Give me your wallet."). United States v. Williams, 553 U.S. 285, 298 (2008).

C.

The First Amendment's overbreadth doctrine provides "breathing room for free expression" because overbroad laws "'may deter or "chill" constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to 'the marketplace of ideas.'" Hansen, 599 U.S. at 769-70 (quoting Virginia v. Hicks, 539 U.S. 113, 119 (2003)). However, because the doctrine is aimed at protecting the "marketplace of ideas," an overbreadth challenge will "[r]arely, if ever . . . succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." Hicks, 539 U.S. at 124.

Overbreadth is unlike a typical facial challenge because it does not require a challenger to "establish that no set of circumstances exists under which the [statute] would be valid." Hansen, 599 U.S. at 769 (alteration in original) (emphasis omitted) (quoting United States v. Salerno, 481 U.S. 739,

18

745 (1987)).  It is therefore "strong medicine" to be used "only as a last resort."  <u>New York v. Ferber</u>, 458 U.S. 747, 769 (1982) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 613 (1973)).

A court may hold a law facially invalid for overbreadth under the First Amendment only if "the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'"  <u>Hansen</u>, 599 U.S. at 770 (quoting <u>Williams</u>, 553 U.S. at 292).  In this regard, "<u>a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep</u>."  <u>Ibid.</u> (emphasis added).  "In the absence of a lopsided ratio" of unconstitutional applications to constitutional ones, "courts must handle unconstitutional applications as they usually do -- case-by-case."  <u>Ibid.</u>

D.

N.J.S.A. 2C:28-5 criminalizes tampering with witnesses and informants.  The text provides:

> (a)  A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted or has been instituted, he knowingly engages in conduct which a reasonable person would believe would cause a witness or informant to:

> (1)  Testify or inform falsely;

19

(2) Withhold any testimony, information, document or thing;

(3) Elude legal process summoning him to testify or supply evidence;

(4) Absent himself from any proceeding or investigation to which he has been legally summoned; or

(5) Otherwise obstruct, delay, prevent or impede an official proceeding or investigation.

Witness tampering is a crime of the first degree if the conduct occurs in connection with an official proceeding or investigation involving [a specific list of crimes] and the actor employs force or threat of force. Witness tampering is a crime of the second degree if the actor employs force or threat of force. Otherwise it is a crime of the third degree.

[N.J.S.A. 2C:28-5(a).]

As earlier noted, the Appellate Division rejected an overbreadth challenge to a previous version of the witness tampering statute in Crescenzi, holding that "[w]hen the public interest in discovering the truth in official proceedings is balanced against a party's right to speak to a particular witness with the intent of tampering, that party's right is 'minuscule.'" 224 N.J. Super. at 148 (citation omitted).

20

IV.

We agree with the Appellate Division that N.J.S.A. 2C:28-5(a) is not unconstitutionally overbroad. However, we hold that the statute may have been unconstitutionally applied to defendant in this case. Thus, without dismissing any part of the indictment, we vacate defendant's conviction for witness tampering and remand for a new trial on that charge.

A.

As an initial matter, we disagree with the Appellate Division that any communication between a defendant awaiting trial and the victim of a violent crime categorically falls outside the protections of the First Amendment. Hill, 474 N.J. Super. at 379. As the Supreme Court has explained, courts reviewing criminal convictions do not have "a freewheeling authority to declare new categories of speech outside the scope of the First Amendment" simply because the "value of the speech" is less than "its societal costs." United States v. Stevens, 559 U.S. 460, 470, 472 (2010). Instead, speech falls outside the scope of the First Amendment if it falls into one of the "historic and traditional categories" to which the First Amendment has not applied. Id. at 468 (citation omitted). As previously noted, those historic and traditional categories include fighting words, obscenity, child pornography, incitement, defamation, true threats, and speech integral to criminal conduct.

21

Communication between a defendant awaiting trial and the victim of a violent crime is not among them.

We therefore address defendant's overbreadth claim. We conclude that, under First Amendment overbreadth doctrine, there are not far more witness tampering prosecutions for protected speech than for conduct or unprotected speech. Indeed, the heartland of witness tampering prosecutions either do not involve speech at all, or prosecute unprotected speech, and therefore do not violate the First Amendment. Thus, we join the Appellate Division in "reject[ing] defendant's . . . overbreadth claim," Hill, 474 N.J. Super. at 379, although for different reasons.

Many applications of N.J.S.A. 2C:28-5(a) are entirely unrelated to speech. For example, a defendant might be found guilty of witness tampering under N.J.S.A. 2C:28-5(a) for physically harming a witness to deter them from testifying or bribing a witness to keep them away from court. See, e.g., State v. Adams, No. A-1021/1343-14 (App. Div. Feb. 19, 2019) (slip op. at 2-3) (to prevent them from testifying at a murder trial, the defendant killed one witness and threatened another);[1] State v. Johnson, No. A-6238-09 (App. Div. Mar. 27,

---

[1] The unpublished Appellate Division decisions we cite here have no precedential value, and we do not rely on them for any legal principles they discuss. R. 1:36-3. We cite these decisions merely as records of prosecutions that have been brought under the witness tampering statute in keeping with the

22

2013) (slip op. at 5-9) (the defendant murdered the victim while released on bail); State v. Seabrookes, No. A-0506-02 (App. Div. Apr. 24, 2006) (slip op. at 5-7) (the week before the defendant's murder trial, he arranged for the victim to be taken out of the state and then transported back to New Jersey and murdered); State v. Deneus, No. A-3698-11 (App. Div. Mar. 24, 2014) (slip op. at 4) (while incarcerated and awaiting trial, the defendant offered $5,000 to another inmate to kill three potential witnesses); State v. Jardim, 226 N.J. Super. 497, 499-500 (Law Div. 1988) (the defendant agreed to pay the victim and her mother $50,000 to leave the state and not return for any grand jury or court proceeding).

The same is true for witness tampering prosecutions in other states and in federal courts. See, e.g., Arnold v. State, 68 S.W.3d 93, 95-96 (Tex. App. 2001) (the defendant paid the witness's travel and living costs so she would evade subpoena to testify at a trial); State v. Sanders, 833 P.2d 452, 454, 457 (Wash. Ct. App. 1992) (the defendant paid and arranged for a key complaining witness to be out-of-state during trial); United States v. Washington, 653 F.3d

Supreme Court's guidance in Hansen. See 599 U.S. at 784-85; see also Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 549 & n.1, 560 (2015) (citing but not relying on an unpublished decision and finding that its "existence" could be considered); State v. Henderson, 208 N.J. 208, 287 n.9 (2011) (noting the existence of, but declining to cite, an unpublished decision in which an identification had been suppressed).

1251, 1253-55 (10th Cir. 2011) (the defendant conspired to kill a witness to prevent him from testifying during a federal court proceeding).

As to witness tampering prosecutions that do involve speech, garden-variety prosecutions are consistent with the First Amendment and Article I, Paragraph 6 of the New Jersey Constitution because they involve speech that is integral to criminal conduct and is thus unprotected.

For example, a defendant may be found guilty of witness tampering for explicitly threatening a witness not to cooperate with an investigation or asking a witness to testify falsely, N.J.S.A. 2C:28-5(a)(1); withhold testimony, (a)(2); elude legal process, (a)(3); absent himself from a proceeding, (a)(4); or otherwise obstruct such a proceeding, (a)(5). See, e.g., State v. Krieger, 285 N.J. Super. 146, 149-50 (App. Div. 1995) (the defendant asked a witness to falsely claim to "know nothing about" transactions underlying the charges against him); State v. Young, No. A-1849-17 (App. Div. Dec. 3, 2018) (slip op. at 5) (the defendant sent the victim "repetitive intimidating threats" to "discourage his testimony" and frequently drove past the victim's home "making hand gestures and calling [the victim] a rat"); State v. Cornish, No. A-3649-05, (App. Div. Dec. 21, 2006) (slip op. at 1) (the defendant offered the victim $100 to drop the charges against him).

Such prosecutions are common in other state and federal courts as well. See, e.g., United States v. Milk, 66 F.4th 1121, 1129 (8th Cir. 2023) (the defendant instructed a co-conspirator to "[f]ollow [his] lead and stick to the code of silence"; "[g]et that story recanted"; and attest that prior statements to law enforcement were "lie[s]" (final alteration in original)); United States v. England, 507 F.3d 581, 583 (7th Cir. 2007) (the defendant threatened to kill his brother-in-law for cooperating with a police investigation); United States v. Norris, 753 F. Supp. 2d 492, 508 (E.D. Pa. 2010) (the defendant agreed to manufacture "false" accounts people "were to parrot when questioned").

On the other side of the ledger, the list of potentially unconstitutional prosecutions under 2C:28-5(a) appears to be either zero or one (this case).

Defendant cites a long list of what he contends are "witness-tampering prosecutions in New Jersey [that] have arisen from a defendant writing a letter to a potential witness. . . . [Or] speaking to a witness."[2]  However, he does not

---

[2] Defendant cites to an unpublished Appellate Division decision, State v. Williams, No. A-0434-15 (App. Div. June 8, 2017), in which a defendant wrote a letter to a victim and the defendant's relatives called the victim on the phone.  The letter is not reproduced in the Appellate Division's decision, and the Appellate Division reversed the defendant's witness tampering conviction. In any event, "[t]he 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge'" because they "would not establish that the statute is substantially overbroad."  Williams, 553 U.S. at 303 (quoting Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984)).

allege that any of those witness tampering prosecutions clearly involved protected speech -- i.e., speech that was not integral to criminal conduct -- and we have found none. For example, defendant cites State v. Mancine, in which the defendant told a witness "[d]on't say anything [to police], just keep your mouth shut and tell them you don't know nothing about it." 124 N.J. 232, 241 (1991). The speech that led to the witness tampering charge in that case was thus integral to the criminal conduct of witness tampering. See ibid.

Defendant maintains that the witness tampering statute is unconstitutionally overbroad because a defendant could be prosecuted for appearing on national television, writing a song, or posting to social media to explain "that he is innocent . . . or why the prosecution is unjust." But this "string of hypotheticals," Hansen, 599 U.S. at 782, are not "realistic" witness tampering prosecutions, id. at 770. Defendant does not point to any actual prosecution that even resembles that fact pattern, and he cannot explain how a television appearance, song, or social media post that proclaimed a defendant's innocence would be "conduct which a reasonable person would believe would cause a witness or informant" to testify falsely or refuse to testify. N.J.S.A. 2C:28-5(a).

At bottom, "the ratio of unlawful-to-lawful applications" of the witness tampering statute "is not lopsided enough to justify the 'strong medicine' of

26

facial invalidation for overbreadth." Hansen, 599 U.S. at 784. Instead, defendant asks us to invalidate the witness tampering statute and threaten a wide swath of prior witness tampering convictions as a remedy for what may be one unconstitutional application of the statute: his own case. This we cannot do. Quite simply, "[t]his is not the stuff of overbreadth -- as-applied challenges can take it from here." Id. at 785.

Because we do not find N.J.S.A. 2C:28-5(a) unconstitutionally overbroad, we decline defendant's invitation to construe the "knowingly" in N.J.S.A. 2C:28-5(a) to apply to both a defendant's conduct and whether the defendant knew that the nature of his conduct would cause a witness to testify falsely.

B.

Although N.J.S.A. 2C:28-5(a) is not facially overbroad, we find that it may have been unconstitutionally applied to defendant in this case because he was prosecuted for the contents of his letter and the jury was not required to find that his letter constituted speech integral to criminal conduct.

The State and the Attorney General both argue that defendant was not prosecuted "because of anything specifically written in the content of the letter," but rather because "he engag[ed] in a course of conduct that involved sending the letter to his victim's home before the trial, making it clear he knew

27

who she was and where she lived." As proof, the Attorney General maintains that had defendant published the same letter "via an open letter in a newspaper, there would have been no conceivable tampering prosecution."

The second assertion is correct; the first is not. It is true that had defendant published a letter in a newspaper, he could not have been prosecuted for witness tampering. And it is true that defendant could have been prosecuted simply for sending a letter to A.Z. in a way that showed he knew her full name, knew where she lived, and was willing to "engage with her directly." But as a factual matter, he was not.

It is clear from the trial transcript that defendant was prosecuted for the contents of his letter. The prosecutor mentioned the contents of the letter in his opening statement. A redacted version of the handwritten letter was entered into evidence and read out loud to the jury. The prosecutor asked the jury during summation to "read [the letter]. You determine . . . what does the letter say?" And again:

> It's your question, you look at the contents, right? What is he saying to her? What is he trying to do? What is a reasonable person to take from it? I'm not going to say more than that. That's for you guys -- read the letter. Think about it in the context of all this, right?

It is therefore unsurprising that during deliberations, the jury requested a typed copy of the letter to review and then, as an alternative, heard a readback of the letter being read out loud by a detective.

Although the State now insists that defendant was prosecuted solely based on the time, place, and manner of his speech (sending a letter, from jail, to A.Z.'s home), the record shows otherwise. It reflects a consistent strategy by the prosecution to refer the jury to the text of the letter itself. Because the State urged the jury to "examine the content of the [letter] . . . to determine whether a violation" of the witness tampering statute had occurred, defendant's prosecution was content based. See McCullen, 573 U.S. at 479.

Defendant's conviction would nonetheless have been unproblematic if the jury had been required to find that his speech fell into a recognized category of speech unprotected by the First Amendment.

Defendant contends that the relevant exception is true threats. According to defendant, "Counterman controls the outcome here," and under the First Amendment the State was thus required to prove "at a minimum, that [defendant] was reckless as to the threatening nature of his speech." But defendant was not prosecuted for any true threat of violence. His letter does not contain any threat of violence against A.Z. And he was prosecuted for third-degree witness tampering, which specifically excludes the use of "force

29

or threat of force." N.J.S.A. 2C:28-5(a). <u>Counterman</u> is thus not relevant to defendant's conviction.

The State maintains that the relevant exception is speech integral to criminal conduct. We agree that, had the jury been required to find that the contents of defendant's letter were speech integral to criminal conduct, the letter would have been unprotected by the First Amendment and there would be no issue with defendant's conviction. However, because the jury was not required to make such a finding, defendant's witness tampering conviction must be vacated and remanded for a new trial.

Defendant's letter is not integral to the criminal act of tampering with a witness on its face. It does not explicitly ask A.Z. to testify falsely, withhold testimony, elude legal process, absent herself from any proceeding, or otherwise obstruct, delay, prevent or impede any official proceeding or investigation. It does not openly encourage A.Z. to do any of those things. And it does not threaten A.Z. if she continues to cooperate with the police or the prosecution.

Because the letter is facially innocuous, in order to prove that it was speech integral to witness tampering, the State was required to prove that defendant intended the letter to cause A.Z. to testify falsely, withhold any testimony or information, elude legal process, absent herself from a legal

proceeding or investigation, or otherwise obstruct, delay, prevent, or impede an official proceeding or investigation.  In the trial below, the jury was not so charged.  Therefore, defendant's conviction for witness tampering must be vacated.

If the State seeks to re-prosecute defendant for witness tampering on remand, it has two choices.  First, it can introduce the envelope addressed to A.Z. and a completely redacted letter, thereby prosecuting defendant for the act of sending a letter to the victim at her home, rather than the contents of the letter itself.  A.Z., of course, can testify as she did initially to how receiving the letter impacted her.

Alternatively, if the prosecution chooses to enter the letter into evidence and focus on the contents of the letter itself, the jury must be charged that defendant can be found guilty of witness tampering only if he intended his letter to cause A.Z. to testify or inform falsely, withhold any testimony, elude legal process summoning her to testify or supply evidence, absent herself from any proceeding or investigation to which she had been legally summoned, or otherwise obstruct, delay, prevent or impede an official proceeding or investigation.  If a jury finds beyond a reasonable doubt that defendant had such an intent, then his speech was integral to the criminal conduct of witness tampering and he may be constitutionally convicted for its contents.

31

Defendant urges us to dismiss the witness tampering charge with prejudice because "the evidence is insufficient" to allow a reasonable jury to conclude "that Hill knew that it was practically certain that his polite, facially innocuous letter would cause the victim to engage in one of the actions specified by the witness-tampering statue." This gets both the law and the facts wrong. First, there is no requirement that a defendant be "practically certain" that their speech "would" cause a victim to withhold testimony. Speech integral to criminal conduct is speech that is "intended to bring about a particular unlawful act." Hansen, 599 U.S. at 783. There is no requirement that the speech succeed. Second, although the letter did not expressly threaten A.Z. or ask her to testify falsely, a reasonable jury could conclude that defendant sent it to pressure A.Z. to refrain from testifying against him at trial -- i.e., intending to tamper with a witness.

We therefore decline to dismiss the witness tampering charge. We also do not disturb defendant's conviction for carjacking under N.J.S.A. 2C:15-2(a)(1).

V.

Although we agree with the Appellate Division's determination that N.J.S.A. 2C:28-5(a) is not facially overbroad, we find that defendant's

32

conviction under that statute must be vacated to ensure that the statute is constitutionally applied to him. We therefore reverse as to count two of his conviction and remand to the trial court for further proceedings consistent with this opinion.


      CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, FASCIALE, and NORIEGA join in JUSTICE WAINER APTER's opinion.